**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**ANDREW B.,**

                              **Plaintiff,**

**v.**

                                                            **19-CV-1079**

**COMMISSIONER OF SOCIAL SECURITY,**

                              **Defendant.**

_____

<u>**DECISION AND ORDER**</u>

Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct any and all further proceedings in this case, including entry of final judgment.  Dkt. No. 14.  Andrew B. ("Plaintiff"), who is represented by counsel, brings this action pursuant to the Social Security Act ("the Act") seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for benefits.  This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).  Presently before the Court are the parties' competing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  Dkt. Nos. 11, 12.  For the following reasons, Plaintiff's motion (Dkt. No. 11) is denied, and the Commissioner's motion (Dkt. No. 12) is granted.

<u>**BACKGROUND**</u>

On September 10, 2015, Plaintiff filed for Supplemental Security Income ("SSI"), alleging that he became disabled on February 1, 2015 by seizures, a shunt in his

brain, depression, and anxiety.  Tr. at 26, 194-213, 214-19, 237.[1]  Plaintiff's application was denied at the initial level and he requested review.  Tr. at 190-93.  Administrative Law Judge John R. Allen ("the ALJ") conducted a hearing on June 27, 2018.  Tr. at  41-63.  Plaintiff, who was represented by counsel, testified as did an impartial vocational expert.  Tr. at 41-63.  On August 17, 2018, the ALJ issued a decision in which he found that Plaintiff was not disabled and, therefore, not eligible for benefits.  Tr. at 26-36.  The Appeals Council denied Plaintiff's request for review, making the ALJ's determination the final decision of the Commissioner.  Tr. at 1-7.  Plaintiff thereafter commenced this action seeking review of the Commissioner's decision.  Dkt. No. 1.

## LEGAL STANDARD

**Disability Determination**

The claimant bears the ultimate burden of proving disability throughout the period for which benefits are sought.  *See* 20 C.F.R. § 416.912(a); *Schauer v. Schweiker*, 675 F.2d 55, 59 (2d Cir. 1982).  The claimant is disabled only if she shows she is unable to engage in any substantial gainful activity due to any medically determinable physical or mental impairment which has lasted, or can be expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.909; *see Barnhart v. Walton*, 535 U.S. 212, 216-22 (2002).

---

[1] Citations to "Tr. __" refer to the pages of the administrative transcript, which appears at Docket No. 6.

A disabling physical or mental impairment is an impairment that results from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). Congress places the burden upon the claimant to establish disability by requiring her to "furnish such medical and other evidence of the existence [of disability] as the Commissioner of Social Security may require." 42 U.S.C. § 1382c(a)(3)(H)(i). The function of deciding whether a person is under a disability within the meaning of the Act belongs to the Commissioner. 20 C.F.R. § 416.927(e)(1); *Pena v. Chater*, 968 F. Supp. 930, 937 (S.D.N.Y. 1997).

The Commissioner has established a five-step sequential evaluation for adjudicating disability claims set forth at 20 C.F.R. § 416.920. A finding of disabled or not disabled at any step ends the process. 20 C.F.R. § 416.920(a)(4). Plaintiff has the burden at the first four steps, and the Commissioner only has the burden at the fifth step of demonstrating that the claimant can perform other work existing in significant numbers in the national economy, but the burden of proving disability is always on the claimant. *See* 20 C.F.R. § 416.920; *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) ("[t]he claimant bears the ultimate burden of proving [disability] throughout the period for which benefits are sought" (citation omitted)).

**District Court Review**

42 U.S.C. § 405(g) authorizes a district court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of

3

the Commissioner of Social Security, with or without remanding the cause for a rehearing."

42 U.S.C. § 405(g) (2007).  Section 405(g) limits the scope of the Court's review to two

inquiries:  whether the Commissioner's conclusions were based upon an erroneous legal

standard, and whether the Commissioner's findings were supported by substantial

evidence in the record as a whole.  *See Green-Younger v. Barnhart*, 335 F.3d 99, 105-106

(2d Cir. 2003).  Substantial evidence is "more than a mere scintilla."  *Moran v. Astrue,* 569

F.3d 108, 112 (2d Cir. 2009).  "It means such *relevant* evidence as a *reasonable* mind

might accept as adequate to support a conclusion."  *Id.* (emphasis added and citation

omitted).  The substantial evidence standard of review is a very deferential standard, even

more so than the "clearly erroneous" standard.  *Brault v. Comm'r of Soc. Sec.*, 683 F.3d

443, 447-48 (2d Cir. 2012) (citing *Dickinson v. Zurko,* 527 U.S. 150, 153 (1999)).


When determining whether the Commissioner's findings are supported by

substantial evidence, the Court's task is "'to examine the entire record, including

contradictory evidence and evidence from which conflicting inferences can be drawn.'"

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d

1033, 1038 (2d Cir. 1983) (per curiam)).  If there is substantial evidence for the ALJ's

determination, the decision must be upheld, even if there is also substantial evidence for

the plaintiff's position.  *See Perez v. Chater,* 77 F.3d 41, 46-47 (2d Cir. 1996); *Conlin ex

rel. N.T.C.B. v. Colvin*, 111 F. Supp. 3d 376, 384 (W.D.N.Y. 2015).  Likewise, where the

evidence is susceptible to more than one rational interpretation, the Commissioner's

conclusion must be upheld.  *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## DISCUSSION AND ANALYSIS

**The ALJ's Decision**

The ALJ analyzed Plaintiff's claims using the familiar five-step process. *Lynch v. Astrue*, 2008 WL 3413899, at *2 (W.D.N.Y. Aug. 8, 2008) (detailing the five steps). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 10, 2015, the date of his SSI application. Tr. at 28. The ALJ concluded at step two that Plaintiff's alcohol abuse disorder, history of seizures, neuropathy in the left leg, and cognitive disorder were severe impairments. Tr. at 29.[2] At step three, he concluded that Plaintiff did not have an impairment or combination of impairments which met or equaled the Listings, giving special consideration to Listing 11.17 (Neurodegenerative Disorders of the Central Nervous System, such as Huntington's disease, Friedreich's ataxia, and spinocerebellar degeneration), and Listing 12.02 (Neurocognitive Disorders). Tr. at 29.[3]

The ALJ found that Plaintiff retained the RFC for work at all exertional levels that did not entail any climbing of ladders, ropes, or scaffolds; did not require being around heights or dangerous machinery; and that entailed only simple, repetitive tasks, in a static

---

[2] This Court presumes the parties' familiarity with Plaintiff's medical history, which is detailed at length in the papers.

[3] On January 18, 2017, well before the ALJ's August 17, 2018 decision, the agency published "Revisions to Rules Regarding the Evaluation of Medical Evidence." 82 Fed. Reg. 5844; *see also* 82 Fed. Reg. 15132-01 (March 27, 2017) (amending and correcting the final rules published at 82 Fed. Reg. 5844). These final rules are effective as of March 27, 2017. Some of these new rules state that they apply only to claims filed before March 27, 2017, or only to claims filed on or after March 27, 2017. *See* Notice of Proposed Rulemaking, 81 Fed. Reg. 62560, 62578 (Sept. 9, 2016) (summarizing proposed implementation process). Where relevant, this Court will cite to the rules that the ALJ applied in this case.

environment, having infrequent changes in routine.  Tr. at 31.  At step four, the ALJ found that Plaintiff could not return to his past relevant work as a bartender or cleaner because the requirements of those jobs exceeded his RFC.  Tr. at 34.  The ALJ then proceeded to step five, where he relied upon the testimony of the VE in finding that Plaintiff could do other work that existed in significant numbers in the national economy, such as the unskilled light jobs of fast food worker, cashier, and mail clerk.  Tr. at 35.  Thus, the ALJ concluded that Plaintiff was not disabled.  Tr. at 36.

**Judgment on the Pleadings**

As noted above, the parties have cross-moved for judgment on the pleadings.  Dkt. Nos. 11, 12.  Plaintiff argues that the ALJ erred by not giving more weight to the opinions of his treating sources, Dr. Myers and PA Rood, by rejecting every medical opinion in the record about plaintiff's functioning, creating a gap, and by formulating the RFC based on his own lay opinion.  Dkt. No. 11-1, pp. 10-16.  The Commissioner counters that the ALJ properly based the RFC on Plaintiff's testimony about his symptoms and abilities, his robust activities of daily living, and the treatment records, which showed that his seizure disorder was well-controlled with medication when he cut back on drinking alcohol.  Dkt. No. 12-1, pp. 12-23.  Having reviewed the record in its entirety, this Court finds that the ALJ did not err in reaching his decision and that the RFC was substantially supported.

**Plaintiff's Testimony**

At the June 27, 2018 hearing, Plaintiff testified that he could not work because he had weakness in his right leg.  Tr. at 49.  Plaintiff admitted that his leg weakness was improving (Tr. at 49), and that he was "functioning okay."  Tr. at 50.  He also stated that he could not work because he had a "slight" brain injury from a fall, but that this was improving as well.  Tr. at 49.  Plaintiff reported that he had a history of seizures, but also thought that they were "pretty well under control" with his medication.  Tr. at 51-52.  He acknowledged that he had not had a seizure in at least six months.  Tr. at 51.  Plaintiff reported that he drank a bottle of alcohol every two weeks, which was much less than he used to drink years ago.  Tr. at 52-53.  Plaintiff asserted that he had difficulty with his memory.  Tr. at 54.  He claimed that he experienced confusion at times, but it was "nothing ever major" and "not very often."  Tr. at 58.  He explained that he was an "ex-alcoholic," which was what started "all this in the first place," but he was working on being sober.  Tr. at 59.

Regarding his mental abilities, Plaintiff testified that he got along well with others (Tr. at 55), could finish what he started (Tr. at 57), and did his best to handle stress.  Tr. at 57.  As for his physical abilities, Plaintiff estimated he could lift up to 30 pounds and could sit without limitation.  Tr. at 54.  He estimated that he could stand for four hours before needing to sit down for "a little bit."  Tr. at 53-54.  He stated that walking did not bother him (Tr. at 54), admitted that he walked "a lot" (Tr. at 52), and opined that walking was good for his leg.  Tr. at 46.  Plaintiff also testified about his daily activities, and asserted that he helped his mother out in her dog grooming shop.  Tr. at 47.  He took care

7

of the driveway in the winter, mowed the lawn in the summer, walked his dog, did laundry, and cooked.  Tr. at 55.  He also cleaned the house and read books.  Tr. at 56.  Plaintiff estimated that he could work six-to-eight hours per day, but was not "100 percent" sure. Tr. at 56.


**Medical Evidence from the Relevant Period (September 10, 2015 to August 17, 2018)**

On February 10, 2016, Plaintiff saw Dr. Gregory Castiglia, a neurologist who treated him for residual effects of a brain injury.  Tr. at 381.  Dr. Castiglia noted that Plaintiff suffered a traumatic brain injury "many years ago," which required that a shunt be placed in his brain in 2013.  Tr. at 381.  During the visit, Plaintiff told Dr. Castiglia that he had been doing reasonably well since the shunt placement, and noticed an improvement in his mental status.  Tr. at 381.  Plaintiff also said that "there has been a significant decrease in the number of seizures" since the shunt placement, but he complained of occasional confusion.  Tr. at 381.  He admitted that he continued to binge drink.  Tr. at 381.


On examination, Dr. Castiglia found that plaintiff was alert, appropriate, and cooperative.  Tr. at 382.  Plaintiff was unable to perform a tandem gait, but his strength was symmetric, and he had no pronator drift.  Tr. at 382.  Dr. Castiglia concluded that Plaintiff was doing well from a neurological standpoint, encouraged him to continue to increase his activities, and advised him to return in one year.  Tr. at 382.

On April 4, 2016, Plaintiff had a seizure and sought treatment at Erie County Medical Center ("ECMC").  Tr. at 457.  Plaintiff reported that he had not taken his anti-seizure medication, Dilantin, and had been drinking more heavily than usual.  Tr. at 451.  On April 5, 2016, Plaintiff sought treatment at the substance abuse clinic of ECMC to help with withdrawal symptoms.  Tr. at 442.  He asserted that he experienced shakes and seizures related to his drinking (Tr. at 442-43), but denied having weakness or difficulty with coordination.  Tr. at 444.

On November 2, 2016, Plaintiff saw Dr. Bennett Myers, a neurologist affiliated with the DENT Neurological Institute, for a consultation.  Tr. at 511-14.  Plaintiff reported that he had intermittent pain in his left leg.  Tr. at 511.  He stated that in the past, his leg had a tendency to give out, but that it was improving, and that the strength in his right leg was "good."  Tr. at 511.  He reported that he had difficulty with memory and had been feeling depressed.  Tr. at 511.  He stated that he continued to drink, but less than he did in the past.  Tr. at 511.  On examination, Dr. Myers found that Plaintiff had normal attention and concentration, full orientation, intact language, and a good fund of knowledge.  Tr. at 512.  Dr. Myers further found that Plaintiff had normal long term memory, but that his short term recall was 0 out of 3.  Tr. at 512, 513.  Dr. Myers noted that Plaintiff scored a 21 out of 26 on a mini mental status examination (MMSE), opining that any deficits were "almost certainly due to his chronic alcohol abuse."  Tr. at 513.

Dr. Myers also examined Plaintiff's musculoskeletal system, and found that he had full motor strength, equal reflexes, normal sensation, and normal coordination.  Tr. at 513.  Plaintiff had a wide-based gait, which was mildly unsteady.  Tr. at 513.  Dr. Myers recommended additional testing, such as electromyography and nerve conduction studies, to determine the etiology of plaintiff's foot drop.  Tr. at 513.  Dr. Myers switched Plaintiff's anti-seizure medication from Dilantin to Keppra (Tr. at 513), and advised Plaintiff about the importance of moderate physical activity.  Tr. at 514.

On February 13, 2017, Plaintiff returned to Dr. Castiglia, for a follow-up visit regarding his shunt.  Tr. at 385-86.  Plaintiff asserted that he had been doing well in the past year.  Tr. at 385.  He stated that his new neurologist switched his medication from Dilantin to Keppra, and he had not had any seizures since the switch.  Tr. at 385.  Plaintiff also reported that he cut down on his drinking significantly.  Tr. at 385.  On examination, Dr. Castiglia found that Plaintiff ambulated independently, and had intact motor strength throughout.  Tr. at 386.  Plaintiff was pleasant, cooperative, alert, coherent, and fluent in speech.  Tr. at 386.  Dr. Castiglia concluded that Plaintiff continued to do well, and advised him to return in one year.  Tr. at 386.  Dr. Castiglia also advised Plaintiff to abstain from alcohol completely.  Tr. at 386.

On February 15, 2017, Plaintiff returned to Dr. Myers.  Tr. at 515-18.  Plaintiff reported that he had no breakthrough seizures since starting Keppra.  Tr. at 515.  He stated that his gait dysfunction and balance issues had not changed, but he had not started the physical therapy that had been recommended to him.  Tr. at 515.  He claimed

10

he still had cognitive issues, and was in the process of seeking disability.  Tr. at 515.  On

examination, Dr. Myers found that Plaintiff's attention and concentration were mildly

impaired, his orientation was intact, and his language was spontaneous.  Tr. at 516.

Plaintiff scored four points lower on an MMSE.  Tr. at 516.  On physical examination,

Dr. Myers found that Plaintiff had normal strength, intact sensation, equal reflexes, and a

negative Romberg sign (which tests for balance issues).  Tr. at 516.  Plaintiff had a

moderate-to-severe wide-based gait, but he was only mildly unsteady.  Tr. at 516.

Dr. Myers reported that he spent a great deal of time talking to Plaintiff about his alcohol

abuse, which was "certainly the cause of his cognitive issues, ataxia, and gait

abnormalities."  Tr. at 517.  On March 20, 2017, Dr. Myers wrote a letter for Plaintiff,

indicating that Plaintiff was "unable to work at this time due to his medical condition."  Tr. at

368.


From July 19, 2017, to July 27, 2017, Plaintiff was hospitalized at ECMC for

a seizure.  Tr. at 409.  He reported that he had been compliant with his medication, but Dr.

Jill Frodey, an attending physician, noted that Plaintiff's chart revealed a history of

noncompliance.  Tr. at 409.  Plaintiff's mother also stated that he had not taken his Keppra

the night before the seizure, and that she found many empty bottles of alcohol under his

bed.  Tr. at 416.  Plaintiff, too, admitted that he continued to drink a half bottle of whiskey

twice a week, but claimed he was drinking less than he had done in the past.  Tr. at 409.

During the course of his hospitalization, Plaintiff exhibited no neurological deficits upon

examination.  Tr. at 417.  He was alert and oriented, had good attention and concentration,

and was able to follow three-step commands.  Tr. at 417.  Plaintiff received a work-up for

11

his seizures, and his medication was adjusted.  Tr. at 410-12.  Since toxicological screens were negative for alcohol, his seizure was thought to be related to alcohol withdrawal.  Tr. at 420.  Upon discharge, Plaintiff was advised to not drive a motor vehicle, climb heights, swim unattended, or operate heavy machinery.  Tr. at 410.

On August 1, 2017, Plaintiff went to the emergency room ("ER") of ECMC for a rash on his body.  Tr. at 406.  At the time of the visit, Plaintiff denied dizziness or musculoskeletal symptoms.  Tr. at 407.  On examination, he had a rash, for which he was prescribed Prednisone.  Tr. at 407.  His recent and remote memory was impaired, but his speech, orientation, mood, affect, and gait were all normal.  Tr. at 407.

On August 14, 2017, Plaintiff saw Patrick Rood, a physician's assistant ("PA") specializing in neurology, to follow-up on his seizure disorder.  Tr. at 373.  Plaintiff reported that he had not had any further seizures since the breakthrough seizure that prompted his hospitalization one month prior.  Tr. at 374.  Plaintiff asserted that he was tolerating his medication, which had the side effect of intermittent moodiness, but he did not find this problematic.  Tr. at 373.  He continued to drink alcohol, which PA Rood thought was an inciting factor in his last breakthrough seizure.  Tr. at 373.  Plaintiff felt that his gait had improved "somewhat," his balance was "on and off," and he still experienced some confusion.  Tr. at 373.  On examination, PA Rood found that Plaintiff's gait was moderately-to-severely wide-based, and he had inability to tandem walk.  Tr. at 374.  Motor strength was full, reflexes were equal, and cranial nerve testing was unremarkable.  Tr. at 374.  On mental status examination, PA Rood found that Plaintiff was alert and fully

12

oriented, and had fluent speech and normal attention/concentration.  Tr. at 374.  PA Rood recommended physical therapy to improve Plaintiff's gait, but Plaintiff declined.  Tr. at 374. Plaintiff reported that he was attempting to get permanent disability, and PA Rood agreed that Plaintiff could not work and was permanently disabled.  Tr. at 374.  PA Rood also counseled Plaintiff on the importance of daily physical activity.  Tr. at 375.

On November 8, 2017, Plaintiff had a seizure, and went to the ER at ECMC. Tr. at 393.  Plaintiff's mother reported that he had missed one or more doses of his anti-seizure medications.  Tr. at 396.  She also stated that he was drinking the night prior to his seizure, even though Plaintiff was good at hiding it.  Tr. at 396.

On February 12, 2018, Plaintiff saw Dr. Myers, and the doctor noted that Plaintiff had experienced a breakthrough seizure in November, "again associated with drinking alcohol."  Tr. at 519.  He had cognitive dysfunction "also associated with alcohol abuse."  Tr. at 519.  On examination, Plaintiff scored 20/30 on the MMSE, consistent with "moderate cognitive dysfunction."  Tr. at 520-21.  His attention, concentration, and fund of knowledge were normal.  Tr. at 520.  His gait was normal, his motor strength was full, his reflexes were equal, and his coordination was mildly ataxic.  Tr. at 520.

On February 14, 2018, Plaintiff returned to Dr. Castiglia for a follow-up visit. Tr. at 388.  Plaintiff asserted that he had had only one seizure since his last visit, one year prior, and continued to binge-drink whiskey two times per week.  Tr. at 388.  Examination findings remained mostly the same, except Plaintiff was stiff when he changed positions.

13

Tr. at 389.  Dr. Castiglia noted that Plaintiff would be followed yearly to assess his shunt, and that no further studies would be necessary unless Plaintiff's status changed.  Tr. at 389.

On March 6, 2018, PA Rood, declined to complete a medical source statement about Plaintiff's mental and physical functioning.  Tr. at 508-09.  Instead, PA Rood asserted that Plaintiff was "likely 100% perm[anently] disabled secondary to his breakthrough seizures with moderate cognitive dysfunction."  Tr. at 508.

**The ALJ's Assessment of the Opinions of Dr. Meyers and PA Rood**

Plaintiff contends that the ALJ should have given more weight to the opinions of treating sources, Dr. Meyers and PA Rood, or should have contacted them for clarification.  He further contends that by rejecting all of the opinions of record, the ALJ created an evidentiary gap, which he was required to fill.  This Court does not agree.

As an initial matter, the absence of a supporting medical opinion does not compel remand, where substantial evidence supports the RFC.  *Berry v. Schweiker*, 675 F.2d 464, 468-69 (2d Cir. 1982) (holding that the ALJ's RFC finding, which restricted Berry to non-stressful work, was supported by the clinical findings of an examining psychiatrist and Berry's hearing testimony); *Corbiere v. Berryhill*, 760 F. App'x 54, 56 (2d Cir. Jan. 23, 2019) (affirming the Commissioner's final decision, despite the lack of a medical opinion expressly speaking to the physical portion of the RFC determination of sedentary work, relying instead on the relevant medical findings in the treatment notes); *Monroe v. Comm'r*

*of Soc. Sec.*, 676 F. App'x. 5, 8-9 (2d Cir. 2017) (finding that the ALJ could rely on

treatment notes and activities of daily living to formulate the RFC assessment, and

rejecting the argument that a medical opinion was required); *Johnson v. Colvin*, 669 Fed.

App'x 44, 46 (2d Cir. 2016) (explaining that an ALJ looks to "all of the relevant medical and

other evidence" including relevant medical reports, medical history, and statements from

the claimant when assessing the claimant's RFC).

       The burden is on Plaintiff to prove that he or she is disabled, not the ALJ.

*Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Smith v. Berryhill*, 740 F. App'x 721,

726 (2d Cir. 2018) (explaining that plaintiff had a duty to prove a more restrictive RFC than

the ALJ found).  Hence, the Commissioner's regulations and rulings do not require a

supporting medical opinion, but instead permit the ALJ to base his decision on all relevant

evidence.  20 C.F.R. § 416.920(e) (stating that "we will assess the residual functional

capacity based on all the relevant medical and other evidence in your case record"); 20

C.F.R. § 416.945(a)(3) (the adjudicator will assess the RFC based on all the relevant

evidence in the case record); 20 C.F.R. § 416.913(a)(1), (4) (evidence that can be

considered includes objective medical evidence, such as medical signs and laboratory

findings; as well as evidence from nonmedical sources, including the claimant, such as

from forms contained in the administrative record).  In this regard, the requirement that an

ALJ's decision must be supported by substantial evidence does not mean that it must be

supported by a medical opinion.  Rather, it can be supported by treatment notes,

claimant's statements and/or testimony, his or her activities of daily living, portions of a

medical opinion, or a combination thereof.

In Plaintiff's case, the ALJ relied on Plaintiff's treatment, his statements, and his daily activities, to support the RFC finding.  Tr. at 22.  *See Monroe*, 676 F. App'x at 9. With respect to Plaintiff's cognitive impairment, the ALJ acknowledged that Plaintiff's treatment notes documented complaints of confusion.  Tr. at 30, 373, 381.  However, the ALJ accounted for Plaintiff's confusion by restricting him to simple, repetitive tasks performed in an environment having infrequent changes in routine.  Tr. at 31.  Plaintiff presented no evidence showing that he had additional limitations related to his confusion. Plaintiff's treatment records do not show that he had additional limitations (beyond a restriction to simple and repetitive work).  Plaintiff complained to his practitioners of only occasional confusion in February 2016 (Tr. at 381), and only "intermittent" confusion in August 2017.  Tr. at 373.  And throughout this period, he continued to drink.  Tr. at 373, 381.

Despite Plaintiff's alcohol abuse, objective findings revealed that Plaintiff was coherent (Tr. at 386), alert (Tr. at 386, 417), and oriented (Tr. at 407, 417, 512), had fluent speech (Tr. at 386, 407) and a good fund of knowledge (Tr. at 512), could follow three-step commands (Tr. at 30, 417), and had intact attention and concentration.  Tr. 30, 417, 512. Dr. Myers documented "a moderate cognitive dysfunction," rather than a marked or extreme one.  Tr. at 520-21.  Notably, a moderate cognitive limitation would not preclude unskilled work, the type of work to which the ALJ restricted Plaintiff.  Tr. at 35; *Zabala v. Astrue*, 595 F.3d 402, 409-10 (2d Cir. 2010) (affirming a finding of unskilled work where the evidence showed moderate or less severe limitations in work-related functioning); *Sipe v. Astrue*, 873 F.Supp.2d 471, 479-80 (N.D.N.Y. July 3, 2012) (holding that based on his

16

testimony, as well as medical opinions of the consultative examiner and the non-examining state agency examiner that plaintiff had mild and moderate limitations in all relevant areas, plaintiff could perform unskilled work); *see also Ellis v. Comm'r of Soc. Sec.*, 2012 WL 5464632, at *14 (N.D.N.Y. Sept. 7, 2012) (R&R adopted by *Ellis v. Astrue*, 2012 WL 5464632) ("Moderate limitations in a few of the categories do not rise to the level of substantial loss in the ability to perform the demands outlined in SSR 85-15."). Plaintiff's statements also show that he had no additional limitations related to his confusion. *See Salmini v. Comm'r of Soc. Sec.*, 371 Fed. App'x 109, 112-13 (2d Cir. 2010) (summary order) (citing plaintiff's testimony as substantial evidence supporting ALJ's findings); *Juarez v. Comm'r of Soc. Sec.*, 2009 WL 874041, at *9 (S.D.N.Y. Mar. 26, 2009) (holding that a plaintiff's testimony can constitute substantial evidence supporting the ALJ's findings). Indeed, Plaintiff testified at the hearing that his confusion was "not major" and he did not experience it "very often." Tr. at 33, 59. The ALJ observed that Plaintiff was attentive at the hearing and did not require redirection, thus confirming Plaintiff's statements and the findings of his practitioners. Tr. at 30.

Plaintiff's statements about his abilities and daily activities further indicate that he did not have greater limitations than found by the ALJ. Tr. at 30. Plaintiff explicitly testified that he could finish what he started, without interruption. Tr. at 57. This belies any claim that Plaintiff suffers from disabling confusion. Dkt. No. 11-1, p. 9. Plaintiff also reported that he helped his mother out in her dog grooming shop (Tr. at 47), took care of the driveway in winter (which suggests that he shoveled snow) (Tr. at 30, 55), and mowed the lawn in the summer. Tr. at 30, 55. He also did laundry (Tr. at 30, 55), cooked (Tr. at

30, 47, 55), and cleaned.  Tr. at 56.  Notably, Plaintiff reported that he read books, which requires some level of concentration.  Tr. at 56.  Most tellingly, Plaintiff testified that he could work for six to eight hours despite his cognitive impairment.  Tr. at 31, 56.  Plaintiff's statements about his abilities and daily activities demonstrate that, despite his cognitive issues, he could do work that entailed simple and repetitive tasks.  The ALJ appropriately based his RFC on these statements.

The ALJ also properly evaluated Plaintiff's seizure disorder and incorporated limitations into the RFC that restricted him to work that did not entail climbing of ladders, ropes, or scaffolds, and did not require him to be around heights or dangerous machinery. Tr. at 31.  These restrictions were not made up, but rather were based directly on the July 2017 discharge advice from ECMC that Plaintiff not engage in activities that could be unsafe for someone with a seizure disorder, such as driving a motor vehicle, climbing, swimming unattended, or operating heavy machinery.  Tr. at 410.  There is no evidence that Plaintiff required additional restrictions.  In fact, Plaintiff admitted at the hearing that his seizure disorder was "pretty well under control" with his medication.  Tr. at 51-52.  And he acknowledged that he had not had a seizure in at least six months.  Tr. at 31, 51.

Plaintiff's treatment records confirm that he had only a few seizures during the relevant period.  Tr. at 385.  In February 2016, Plaintiff reported that he had done well during the prior year, and noted a decrease in the number of seizures since his 2013 shunt placement.  Tr. at 381.  As the ALJ noted, Plaintiff did not have any seizures for several months after his medication was switched from Dilantin to Keppra in November 2016.  Tr.

at 32, 385, 513.  The seizures that Plaintiff did suffer in April 2016, July 2017, and November 2017 were related to his abuse of alcohol (against medical advice) and his failure to take his anti-seizure medication.  Tr. at 32-33, 396, 416, 451.  Notably, a failure to follow prescribed treatment "without a good reason" precludes a finding of disability under the regulations.  20 C.F.R. § 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled or blind or, if you are already receiving benefits, we will stop paying you benefits"); *Campbell v. Comm'r Soc. Sec.*, 465 F. App'x 4, 7 (2d Cir. 2012) (noting that when the claimant had seizures, it was often caused by his failure to take medications).  Thus, the evidence related to Plaintiff's seizure disorder reveals that the seizures were infrequent and controlled by medication, and typically brought on by his use of alcohol.  Even if they were not, the ALJ accounted for them when he restricted Plaintiff to work that did not entail any hazards, such as climbing ladders, ropes, or scaffolds, or being around heights or dangerous machinery.  Tr. at 31.

The ALJ noted that Plaintiff's activities were robust, despite his seizure disorder, further undermining his argument that he was debilitated by his condition.  As discussed, Plaintiff helped his mother out in her dog grooming shop (Tr. at 47), took care of the driveway in winter (Tr. at 31, 55), mowed the lawn in the summer (Tr. at 31, 55), did laundry (Tr. at 31, 55), cooked (Tr. at 31, 47, 55), and cleaned the house.  Tr. at 56. These activities of daily living do not demonstrate that Plaintiff was more limited by his seizure disorder than the ALJ found.

Finally, the ALJ considered the evidence related to Plaintiff's gait, and reasonably determined that Plaintiff could certainly do the light jobs identified by the VE.  In February 2016, Dr. Castiglia observed that plaintiff had a wide-based gait, but instead of assessing restrictions, he encouraged Plaintiff to increase his activities.  Tr. at 382.  In November 2016, Dr. Myers also observed that Plaintiff had a wide-based gait, but noted that it was only mildly unsteady.  Tr. at 513.  Dr. Myers, like Dr. Castiglia, did not impose any exertional restrictions, but instead encouraged Plaintiff to do moderate physical activity daily.  Tr. at 514.  By February 2017, Dr. Castiglia noted that plaintiff ambulated independently, and identified no issues with respect to Plaintiff's gait.  Tr. at 386.  In July 2017, Plaintiff demonstrated no neurological deficits, including no limb ataxia or impaired balance.  Tr. at 417.  In August 2017, Plaintiff had a normal gait when examined in an ER.  Tr. at 407.  That same month, he had a wide-based gait when examined by PA Rood, but when he was offered a referral to physical therapy, Plaintiff declined it.  Tr. at 374.  In February 2018, his gait was normal.  Tr. at 520.  All of this evidence suggests that Plaintiff's gait was not constantly impaired or as disabling as Plaintiff suggests.

Plaintiff's treatment notes confirm his testimony that his leg issue improved over time.  Tr. at 49.  He stated that walking did not bother him.  Tr. at 54.  He asserted that he walked "a lot" (Tr. at 52), explaining that he thought walking was actually good for his leg.  Tr. at 46.  He also testified that he was able to stand for four hours at a time before needing to sit for a little bit.  Tr. 31, 53.  Most tellingly, he testified that he could work for six to eight hours.  Tr. at 31, 56.  Plaintiff also engaged in challenging physical

activities, such as mowing the lawn and taking care of the driveway, which undermine his allegation that he was disabled by his gait impairment.  Tr. 31, 55.

Based on the foregoing evidence, the ALJ reasonably found that Plaintiff had no exertional limitations and could do the light jobs identified by the VE, and could perform simple, repetitive work in a static environment.  In reaching the RFC, the ALJ considered, and reasonably gave little weight to, Dr. Myers' March 2017 statement that Plaintiff was unable to work at the time due to his medical conditions.  Tr. at 34, 368.  The ALJ rightfully noted that a determination of disability is reserved to the Commissioner of Social Security.  Tr. at 34; 20 C.F.R. § 416.927(d); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that a claimant is disabled cannot itself be determinative.").  As the ALJ further noted, Dr. Myers' conclusory statement was not explained, and was not supported by objective facts or even a diagnosis from which specific limitations might be inferred.  Tr. at 34.  These are appropriate considerations for an ALJ in assessing how much weight to afford a medical opinion.  *See* 20 C.F.R. § 416.927(c)(3) (the ALJ will consider whether the opinion is supported by medical findings and how well explained the opinion is).

The ALJ was also factually correct that Dr. Meyers' opinion was vague and unsupported.  For example, Dr. Myers did not indicate whether he intended to preclude Plaintiff from all work, or only Plaintiff's most recent type of work.  Tr. at 34, 368.  Dr. Myers' own examination findings were largely benign and did not support a finding that Plaintiff could not do any work.  Rather, his examinations revealed that Plaintiff had normal

attention and concentration, normal memory, full orientation, intact language, and a good fund of knowledge.  Tr. at 512, 520.  Dr. Myers' examination of Plaintiff's musculoskeletal system showed that he had full motor strength, equal reflexes, normal sensation, normal coordination, and only a mildly-antalgic gait.  Tr. at 513, 520.  Dr. Myers' opinion is also inconsistent with other evidence discussed throughout the ALJ's decision, reflecting largely benign physical and mental status findings.  Tr. at 31, 33; 20 C.F.R. § 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that medical opinion.").

Dr. Myers' opinion was also inconsistent with Plaintiff's daily activities, which included helping his mother in her dog grooming business.  *See Roma v. Astrue*, 468 F. App'x 16, 19 (2d Cir. 2012) (agreeing with the ALJ that the treating source's opinion conflicted with the claimant's testimony that he could perform a broad range of activities, including driving, reading, sending e-mails, and independently performing activities of daily living).  These are all good reasons for giving little weight to Dr. Myers' opinion.

The ALJ also considered PA Rood's August 2017 statement that Plaintiff was unable to work and was permanently disabled, and his March 2018 statement that Plaintiff was likely permanently disabled due to his seizures.  Tr. at 34, 374, 508.  The ALJ provided several reasons for declining to accord any weight to PA Rood's statements, including the fact that his significantly restrictive assessment was not consistent with his mild examination findings or with other evidence in the record.  Tr. at 23, 34.  Again, these are appropriate factors for an ALJ to consider in assessing the weight to be afforded to a

treating source.  20 C.F.R. § 416.902 (physician's assistant not appearing in the list of acceptable medical sources for claims filed before March 27, 2017); 20 C.F.R. § 416.927(c)(3) (supportability); 20 C.F.R. § 416.927(c)(4) (consistency); *see also Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (finding that the ALJ reasonably declined to afford controlling weight to the treating physician's assessment for less than sedentary work because the opinion was inconsistent with other substantial evidence of record, including the treating physician's own findings).

Moreover, the ALJ was correct that PA Rood had mostly benign findings and that his restrictive assessment conflicted with the balance of the record.  For example, PA Rood found that Plaintiff's motor strength was full, his reflexes were equal, and his cranial nerve testing was unremarkable.  Tr. at 374.  Although PA Rood found that Plaintiff had a wide-based gait, he offered Plaintiff physical therapy, a rather conservative form of treatment.  Tr. at 374.  Similarly, on mental status examination, PA Rood noted that Plaintiff was alert and fully oriented, and had fluent speech and normal attention and concentration.  Tr. at 374.  In March 2018, PA Rood declined to complete a medical source statement about Plaintiff's mental functioning, even though he was asked to do so.  Tr. at 508-09.  Moreover, the longitudinal record from Plaintiff's other practitioners showed that his seizures were infrequent and under control when he was taking his medication and was not drinking alcohol.  Tr. at 34, 508.  PA Rood himself noted in August 2017 that Plaintiff had not had any seizures since his increased medication dosage.  Tr. at 374.  Based on the foregoing, the ALJ reasonably declined to rely on PA Rood's opinion as well.

Given the abundance of evidence relating to Plaintiff's abilities, this Court finds that the ALJ's rejection of the opinions of PA Rood and Dr. Myers did not create a gap in the record that would require further development.  *See Dougherty-Noteboom v. Berryhill*, 2018 WL 3866671, at *9 (W.D.N.Y. Aug. 15, 2018) (declining to find that a gap in the record existed where the ALJ gave little weight to the only opinion in the record about plaintiff's physical limitation); *see also Johnson v. Colvin*, 669 Fed. App'x 44, 46 (2d Cir. 2016) (finding that the presence of a vague opinion did not constitute a gap, where there was sufficient other evidence supporting the ALJ's determination).  Under the regulations in effect at the time of the ALJ's August 17, 2018 decision, when faced with an inconsistency, the ALJ must develop the record further only if he or she finds that the existing record is insufficient.  20 C.F.R. § 416.920b(b)(1); *Rachelle G. v. Comm'r of Soc. Sec.*, 2019 WL 162018, at *9 (N.D.N.Y. 2019) (finding that the ALJ did not err in failing to recontact plaintiff's treating sources for statements or further information, and agreeing with the Commissioner that the record was adequate for the ALJ to reach a reasoned conclusion without a need to obtain a medical statement from the claimant's providers).

In this case, the ALJ had Plaintiff's treatment notes, his hearing testimony about the controlled state of his conditions, and other information about his symptoms and daily activities.  This was sufficient evidence for the ALJ to decide Plaintiff's RFC.

Plaintiff clearly disagrees with the ALJ's evaluation of the evidence. However, the substantial evidence standard is so deferential that "there could be two contrary rulings on the same record and both may be affirmed as supported by substantial

evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 127 (2d Cir. 2012).  That is, "once an ALJ finds the facts, [a reviewing court] can reject those facts only if a reasonable factfinder **would have to conclude otherwise**."  *Brault*, 683 F.3d at 448 (emphasis added).  This case does not present such a situation.  For all of the foregoing reasons, this Court finds that the ALJ's decision is free from legal error and is supported by substantial evidence.

## <u>CONCLUSION</u>

For the reasons stated herein, Plaintiff's motion for judgment on the pleadings (Dkt. No. 11) is hereby DENIED, and the Commissioner's motion for judgment on the pleadings (Dkt. No. 12) is GRANTED.  The Clerk of the Court is directed to close this case.

**SO ORDERED.**

DATED:      Buffalo, New York
            March 24, 2021


            *<u>s/ H. Kenneth Schroeder, Jr.</u>*
            **H. KENNETH SCHROEDER, JR.**
            **United States Magistrate Judge**

25